IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LARRY DEWEESE and HOLLIS STRICKLAND, | ) ) ) | Civil No. 08-860-JE |
| Plaintiffs, | ) ) | FINDINGS AND RECOMMENDATION |
| v. | ) ) | |
| CASCADE GENERAL SHIPYARD, | ) ) | |
| Defendant. | ) ) ) | |

Paul M. Ostroff
Lane Powell, PC
601 S.W. 2nd Avenue, Suite 2100
Portland, OR 97204-3158

       Attorney for Plaintiffs

P. K. Runkles-Pearson
Victor Joseph Kisch
Stoel Rives LLP
900 S.W. 5th Avenue, Suite 2600
Portland, OR 97204

       Attorneys for Defendant

FINDINGS AND RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Larry DeWeese and his brother Hollis Strickland bring this action alleging race-based employment discrimination against defendant Cascade General Shipyard (Cascade).  Defendant moves for summary judgment.  The motion should be granted in part and denied in part as set out below.

### Factual Background

Plaintiffs are African-Americans who worked for defendant Cascade as pipefitters at its shipyard in Portland, Oregon, during several months in 2007.  They were the only African-American Pipefitters at the Cascade facility from April, 2007, through June, 2007.  Plaintiffs are members of the Plumbers and Pipefitters Union Local 290 (the Union), which has a collective bargaining agreement (CBA) with Cascade.

The CBA between Cascade and the Pipefitters Union provides that members' rights to work overtime are based on the employee's task and on the ship that the employee is working on, and allows Cascade to assign pipefitters based upon their skill and ability.

Plaintiffs were not certified welders.  Cascade has submitted the declarations of Mike Trautman, Cascade's Employee Relations Manager, and Randy Wolvert, who worked as Cascade's Craft Manager during 2007.  Trautman and Wolvert both declare that pipefitters who are not certified may "spot weld" pieces of pipe together but are "not qualified to complete the final work that requires a soundly welded tight seal."

Plaintiffs contend that uncertified welders are qualified to complete work requiring a tight seal.  In a declaration submitted in opposition to Cascade's motion for summary judgment, Strickland states that, before 2007, he performed the full scope of pipe welding

and fitting duties when he worked at Cascade, and that he had performed the full scope of

welding duties at various times when he worked for Cascade from March, 2007, through

June, 2007.  Cascade asserts that, if this is true, it is irrelevant, "because there is no evidence

that any Cascade General supervisor permitted Mr. Strickland to perform activities that

should have been performed by a certified welder."

According to Wolvert's declaration, on March 22, 2007, James Leino, a foreman,

reported that plaintiff Strickland "'got in his face' and had threatened him, spitting in his face

and spraying fluid into his face while yelling."  Wolvert states that he spoke with plaintiff

Strickland about the incident, and that Strickland told him that he was angry with Leino "for

using profanity."  He adds that Strickland admitted his actions were inappropriate.  Plaintiffs

disagree with Wolvert's description of this incident, including his assertion that Strickland

acknowledged that he had acted inappropriately.

On April 1 and 2, 2007, plaintiffs worked overtime on a dredge piping system on the

*Essayons*.  Cascade has submitted the declaration of Kevin Peterson, who was plaintiff's

foreman on the *Essayons*.  Peterson states that, on April 3, 2007, he received a call asking

him to release workers from the *Essayons*, where the work was nearly finished, to other ships

that needed more workers.  Peterson states that he released plaintiffs because they had

finished their work on the dredge piping system, and that other pipefitters remained on the

*Essayons* to complete work on the CO2 system.  He further states that plaintiffs were

transferred to the *Yukon*, which was the "priority" ship most in need of additional workers.

Peterson states that he believes that he would have violated the CBA if he had sent other

Pipefitters to the *Yukon* because doing so "would have interfered with their item rights to

work on the $CO_2$ system."  Peterson's statements are included in the fourth paragraph of Cascade's Concise Statement of Material Facts.

Plaintiffs agree that they worked on the *Essayons* on April 1 and 2, 2007, and agree that they were transferred to the *Yukon* on April 3, 2007.  They deny the remainder of the material in the fourth paragraph of defendant Cascade's Concise Statement of Material Facts. In the sixth paragraph of their own statement of facts, plaintiffs assert that neither of them were offered any overtime work from April 3, 2007, through April 23, 2007, and that 16 other pipefitters at Cascade were offered, and worked, overtime during that period.  In its response, Cascade reiterates its contention that plaintiffs turned down opportunities for overtime, and asserts that, even if plaintiffs' assertion is true, it "is immaterial because there is no evidence that others received overtime that plaintiffs were entitled to receive."

Overtime work available on weekends is normally offered on Fridays at Cascade. When their depositions were taken, plaintiffs testified that they left work at 9:15 a.m. on Friday, April 6, 2007.  Cascade contends that overtime would not have been offered that early in the day, and plaintiff Strickland testified that he does not know whether he was at the workplace when overtime was offered that day.  Strickland testified that he was offered overtime work the following weekend, but declined the offer, and Cascade has submitted time records indicating that plaintiffs worked overtime on April 19, April 24-29, May 2-4, May 10-15, May  17-19, and May 21-22, 2007.   Plaintiffs deny these assertions.

Plaintiffs contend that they were physically segregated from other workers during April, 2007, when they were assigned to work in the lower section of a vessel that was six or seven blocks away from all other workers.  They further assert that "[n]o foreman would visit

FINDINGS AND RECOMMENDATION - 4

them for several days at a time."  Cascade denies that plaintiffs were segregated from other

workers, and asserts that its "ship repair work, by its very nature, requires employees to

occasionally work independently or in an isolated location."  Though they continue to assert

that they were segregated on the basis of their race, plaintiffs do not dispute that the kind of

work that Cascade performs on ships requires employees to occasionally work independently,

or to work in isolated locations.

In a letter dated April 16, 2007,  to the Equal Employment Opportunity Commission

(EEOC); Dan Gardner, Oregon State Labor Commissioner; the United States Department or

Labor; and Cascade,  plaintiff Strickland alleged that Cascade had discriminated against him,

denying opportunities for overtime and advancement, because of his race.  Plaintiff also

complained to Al Shropshire, the business agent at Local 290, concerning Cascade's

allegedly unlawful and discriminatory practices.  In a grievance form dated April 20, 2007,

the Union asserted that plaintiffs had not been offered overtime, while other employees,

who were not pipefitters, were working overtime on "pipefitter work."  The grievance was

arbitrated in proceedings in which the Union and Cascade were represented by counsel.  In a

decision dated April 2, 2008,  the arbitrator found that the Union had failed to establish that

Cascade had violated the CBA by offering overtime work to others which was not offered to

plaintiffs.

Trautman received a copy of plaintiff Strickland's letter of April 16, 2007, and

immediately scheduled a meeting with plaintiffs.  Plaintiffs raised a number of concerns

during a meeting with Trautman on April 18, 2007.  Following an investigation, Trautman

prepared written findings and summarized the results of his investigation in a letter he presented to plaintiffs during a meeting with them on April 26, 2007.

Plaintiff Strickland complained that some Cascade employees were talking about dropping tools on plaintiffs. He did not provide Cascade the names of any employees who allegedly made these threats. Cascade contends that, though it investigated this complaint, it could take no action on the alleged threats without more information. In their Concise Statement of Material Facts, plaintiffs assert that Harold Hemmings, a co-worker of plaintiff Strickland, told Strickland about the threats, and that Strickland told Bowers, his foreman, but that "Cascade took no action."

In a letter to Trautman dated April 30, 2007, plaintiff Strickland set out a number of concerns about Trautman's earlier investigation. In a letter dated May 4, 2007, Trautman informed Strickland that nothing in Strickland's letter had altered the conclusions stated in the letter he had provided Strickland earlier.

Kevin Peterson, who supervised plaintiffs and other pipefitters working on the Essayons, was assigned to work as a foreman in early 2007. At the time, he had at least 10 years of supervisory experience, and had worked as a ship superintendent, which is a position that is higher than that of a foreman. The parties agree that, as a former ship superintendent and machinist, Peterson had the technical knowledge required to supervise pipefitters. They also agree that plaintiff Strickland, who was never promoted to a foreman position, has no supervisory experience listed on his resume.

On April 23, 2007, Trautman learned that a confrontation had occurred involving plaintiff Strickland and Brent Shropshire, a coworker, on the gangway of a ship some 80 feet

above the water.  According to plaintiff Strickland, Shropshire threatened him, said "I will fuck you up," and told him that "Black people are always trying to complain about something."  Shropshire told Cascade that Strickland had threatened him.  As a result of the incident, plaintiff Strickland and Shropshire both received written warnings citing a provision of Cascade's Workplace Violence Policy describing "a threat of violence" as "any course of conduct that is intended to cause and would cause a reasonable person to believe that he or she is under a threat of bodily injury or death."

On April 27, 2007, Derrick Bristow, a Cascade supervisor, forwarded an e-mail captioned "Proud To Be White" to a number of recipients on Cascade's e-mail system.  The e-mail included references such as "nigger," "kike," "towel head," and "sand nigger," belittled ethnic holidays, and imputed criminal conduct to persons who were not white, asserting that "you rob us, carjack us, and shoot at us."  In addition to the designated recipients, other employees received copies of the e-mail or were told about its contents. Many Cascade employees learned about the e-mail and its contents.

About an hour after the "Proud to Be White" e-mail was received, Cascade sent the recipients at Cascade an e-mail stating that the e-mail was "clearly inappropriate," and instructing the recipients to delete it from their computers and to refrain from forwarding it "to anyone inside or outside the organization" [Emphasis in original].  Bristow, who had initially forwarded the e-mail, was suspended pending an investigation.  He was subsequently demoted from his supervisory position, barred from computer access for one year, suspended without pay for 30 days, required to attend "sensitivity training," and warned that any future

violations of Cascade's policies or work rules, or violations of federal, state, or local laws would result in his immediate termination.

Plaintiffs received a printed copy of the "Proud To Be White" e-mail from James Arnold, whom plaintiffs describe as a supervisor. Cascade has submitted evidence that Arnold was not a supervisor. Plaintiff Strickland has testified that he did not complain about the e-mail to any supervisor. Both plaintiffs assert that they found the e-mail offensive and disturbing. Plaintiff Strickland complained about the e-mail in a letter to the EEOC dated May 6, 2007. On May 15, 2007, Cascade's Human Resources Department asked plaintiffs to attend a meeting concerning the e-mail. Strickland asserts that, at the meeting, he complained that the e-mail was racially offensive. He also asserts that Cascade never told him what steps it would take to prevent similar communications or indicated what steps, other than Bristow's discipline, would be taken to prevent a reoccurrence of this type of conduct.

On May 7, 2007, plaintiff Strickland found a drawing on the wall of a bathroom stall depicting a man wearing a hat and another man with the word "Rat" written on his hat. He has testified that he thought the drawing of the first man was intended to depict him, and that nothing other than the fact that the drawing was placed on a bathroom wall was offensive. Strickland now asserts that he had observed other offensive graffiti on walls in the bathroom that was directed at him, accused him of being a "whistleblower," and made racially discriminatory statements about him.

In his declaration, Wolvert states that on May 24, 2007, he learned that plaintiff Strickland had responded in a threatening manner to an order from Bill Lowe, a supervisor,

that he return to work.  Plaintiff asserts that he came out of his work area to get a drink of

water that day, and that Lowe told him to "get his fucking butt" to his own area.  Strickland

states that he told Lowe that he could not "talk to an employee like that," and that Lowe

responded by yelling and "spew[ing] profanity" at him.

Wolvert states that, after learning of the incident,  he met with Strickland and Lowe,

and that he told Strickland that he was demonstrating a "pattern of confrontations," and that,

rather than challenging the supervisor's authority, he should bring any further concerns to

Wolvert's attention or complain through the grievance process.  Wolvert states that

Strickland responded by making what Wolvert interpreted as threatening statements to him.

He adds that his interpretation of the statements as threats was shared by three others who

were present at the meeting.  Strickland denies making threatening statements to Wolvert.

Cascade acknowledges that Lowe used inappropriate language, including the "fucking

ass" remark, during the May 24, 2007 incident, and agrees that Lowe had behaved in this

manner towards others in the workplace before.  Strickland contends that Lowe was not

disciplined.  Wolvert has testified that he "counseled" Lowe that his behavior was

inappropriate.

According to his declaration, Trautman investigated the incident involving Strickland

and Lowe and Strickland's meeting with Wolvert.  Trautman states that, in light of

Strickland's "disciplinary history," recent incidents involving Strickland and other Cascade

employees, and the conclusion that Strickland had threatened Lowe and Wolvert, he,

Wolvert, and Director of Crafts Ray Herndon agreed that Strickland should be suspended for

two days.  Strickland's suspension was imposed through a document entitled "Disciplinary

Action," and dated May 25, 2007.  The document indicated that plaintiff was suspended "pending investigation."

On August 16, 2007, plaintiff DeWeese was arrested at Cascade by federal marshals on an outstanding warrant.  According to his declaration, Trautman learned that DeWeese had been convicted on multiple charges of raping women in secluded locations.  Trautman has stated that these convictions had not been disclosed in DeWeese's application for employment, and he was not aware of them before this time.

Under Cascade's attendance policy, an employee is deemed to have "quit" if he does not come to work or call in before the start of a shift for three days in a row.  Plaintiff DeWeese was scheduled to work on August 17, 20, and 21, 2007, and did not come to work or call in to report his absence.  Trautman has declared that he faxed a form to the Pipefitters Union after the scheduled start of DeWeese's shift on August 21, 2007, indicating that DeWeese was deemed to have quit work.  He also states that he deemed DeWeese ineligible for rehire because he was concerned about the safety of Cascade's female employees, who often worked in secluded areas in the shipyard.  A Cascade document entitled "Layoff Notification" dated August 20, 2007, indicates that DeWeese was not to be rehired.  The "comments" portion of the form included the following note: "Arrest for outstanding warrant while at work and history of violent crime."  The initials RW, presumably identifying Randy Wolvert, were written in the "authorized signature" line.

Plaintiff DeWeese has testified that he was unable to call during the first three work days following his arrest because he was in jail.  He also testified that he called the Union Hall on the day he was released to ask if he still had a job, and was told that he had been laid

off.  The Union filed a grievance concerning DeWeese's "no rehire" designation

on February 6, 2008.  It withdrew the grievance in a letter dated April 14, 2008.


**Plaintiffs' Claims**

Plaintiffs' complaint alleges that Cascade unlawfully discriminated against plaintiffs

because of their race.  The complaint alleges that the discriminatory acts include, but are not

limited to, the following:

-Denying plaintiffs the right to work overtime or premium pay opportunities;

-Segregating plaintiffs from others in the workplace;

-Failing to promote plaintiff Strickland to a foreman position;

-Subjecting plaintiffs to a racially hostile work environment, including dissemination
of racist written material; threats of physical harm; and discouraging others from
associating with plaintiffs;

-Engaging in intimidating and harassing behavior against plaintiff Strickland;

-Suspending plaintiff Strickland because of his opposition to Cascade's
discriminatory practices;

-Laying off plaintiff DeWeese and designating him as ineligible for rehire;

-Denying plaintiffs other work assignments and employment opportunities with
Cascade; and

-Failing to take prompt or appropriate remedial action in response to plaintiffs'
complaints about intimidating, harassing conduct and a hostile work environment.

Plaintiffs bring three claims.  The first claim alleges that Cascade discriminated

against plaintiffs in the "terms, conditions, and privileges of their employment on the basis of

their race" in violation of Title VII, ORS 659A.030, and 42 U.S.C. § 1981.

Plaintiffs' second claim alleges that Cascade violated Title VII, ORS 659A.030(1)(f), and 42 U.S.C. § 1981 by retaliating against them in response to their opposition to unlawful racial discrimination.

Plaintiffs' third claim alleges that Cascade violated 42 U.S.C. § 1981 by impairing their "employment contract rights" on the basis of their race.

### Standards

Federal Rule of Civil Procedure 56 (c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. Id. When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. Id. at 630-31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985).  No genuine issue for trial

exists, however, where the record as a whole could not lead the trier of fact to find for the

nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).


**Discussion**

I. **First Claim: Alleged disparate treatment in violation of Title VII, ORS 659A.030, and
42 U.S.C. § 1981**

A. **Method of analyzing claims**

Plaintiffs' first claim alleges that Cascade violated Title VII, ORS 659A.030, and 42

U.S.C. § 1981.  These statutes all prohibit employers from making adverse employment

decisions based upon an individual's race.  See 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981;

Or. Rev. Stat. § 659A.030.  The same legal standards apply when analyzing claims brought

pursuant to any of these statutes.  See Fonseca v. Sysco Foods Servs. of Ariz. Inc., 374 F.3d

840, 850 (9th Cir. 2004)  (courts apply same legal principles in analyzing Title VII and § 1981

claims); Snead v. Metropolitan Property & Cas. Ins. Co., 237 F.3d 1080, 1090 (9th Cir. 2001)

(under Erie doctrine, federal courts apply state substantive law and federal procedural law in

actions based upon diversity); School Dist. No. 1 v. Nilsen, 271 Or. 461, 469, 534 P.2d 1135,

1139 (1975) (courts to construe Oregon anti-discrimination statutes and Title VII, as

identical).

In analyzing these claims, federal courts apply a "burden shifting" method first set out

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Plaintiffs bear the initial burden

of establishing a *prima facie* case of intentional discrimination.  Id. at 802.  Plaintiffs may establish a *prima facie* case of unlawful discrimination through either direct or circumstantial evidence.  E.g., Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003).  Direct evidence is evidence that, if believed, proves discriminatory intent without the need for any inference of presumption.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).  A plaintiff may also establish a *prima facie* case of unlawful discrimination by showing that he belonged to a protected class, was qualified for the position in question, was subjected to an adverse employment action, and others who were not in the protected class were treated more favorably.  E.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002) (citations omitted).

Establishing a *prima facie* case creates a presumption of unlawful discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If a *prima facie* case is established, by indirect evidence the burden of production shifts to the defendant, who must show evidence that the adverse action was taken for other than impermissibly discriminatory reasons.  See id.  If the defendant produces such evidence, the presumption of unlawful discrimination disappears, and the plaintiff must show by a preponderance of the evidence that the employer's proffered reason was merely a pretext for a discriminatory motive.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (citing Lowe v. City of Monrovia, 775 F.2d 998, 1007 (9th Cir. 1985)).  To do so, the plaintiff cannot simply rely upon the *prima facie* case and deny the credibility of the defendant's witnesses.  Id. at 890 (citing Schuler v. Chronicle Broadcasting Co., Inc., 793 F.2d 1010, 1011 (9th Cir. 1986)). Instead, the plaintiff must produce "specific, substantial evidence of pretext."  Wallis, 26 F.3d

at 890 (quoting Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983)).  Pretext may be

established either by showing that "a discriminatory reason more likely motivated the

employer or ... that the defendant's proffered explanation is unworthy of credence."  Chuang

v. University of California Davis, 225 F.3d 1115, 1123 (9th Cir. 2000).  The ultimate burden

of persuading the trier of fact that the defendant intentionally discriminated always rests with

the plaintiff.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43 (2000).


B. **Application to facts presented in this action**

Cascade contends that plaintiffs have not produced direct evidence of unlawful racial

discrimination.  I agree.  Plaintiffs have not produced evidence that Cascade's supervisory

personnel made negative comments concerning plaintiffs' race, or otherwise overtly

demonstrated discriminatory animus.  The question therefore is whether plaintiffs have

produced evidence that is sufficient to establish a prima facie case of unlawful discrimination

that satisfies the "burden shifting" method.  As noted above, a presumption of unlawful

discrimination arises if a plaintiff can show that he belonged to a protected class, was

qualified for the position in question, was subjected to an adverse employment action, and

others who were not in the protected class were treated more favorably.  In analyzing

plaintiffs' first claim, I will address the particular acts of discrimination alleged in the order

they are discussed in defendant Cascade's opening memorandum.

1. **Overtime**

Plaintiffs allege that Cascade discriminated against them on the basis of their race by denying them the opportunity to work overtime in April, 2007.  Cascade contends that plaintiffs cannot establish a prima facie case of discriminatory denial of overtime because plaintiffs have not shown evidence that other similarly situated non-African-American workers were offered more opportunities for overtime work.

I agree.  To be used as valid comparators in the *prima facie* case analysis, other workers who purportedly received more favorable treatment must be similarly situated "in all material respects."  Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006).  Here, under the applicable rules for determining overtime rights, in order to be "similarly situated," other workers would need to have had the same "task" or "item," and "ship" rights as one of the plaintiffs.  If no item or task rights applied, other workers could serve as valid comparators only if they had the same skills as one of the plaintiffs.

A careful review of the evidence before the court supports only the conclusion that plaintiffs cannot establish that other "similarly situated" workers were treated more favorably.  The record establishes that overtime was not always available, and that a ship owner's schedule determined the amount of overtime that would be worked on any particular ship being repaired at Cascade's facility.  Though plaintiffs have testified that others received overtime that they should have been offered, they have also acknowledged that they do not, in fact, know what overtime was available and what other workers were assigned overtime work not offered to them.  When their depositions were taken, plaintiffs identified one individual, Corey Murr, as a worker who received overtime work they should have been offered, and one

day, April 3, 2007, as the day on which Murr was assigned that work.  However, neither plaintiff testified that he knew what work Murr performed at that time, or what work other pipefitters performed at other times at which they were allegedly denied overtime opportunities that they should have received.  For example, when plaintiff Strickland was asked which other pipefitters worked overtime that he should have been offered on April 21 and 22, 2007, he responded: "I actually don't know who was there and who was not."

Cascade has submitted substantial evidence that the individuals who were offered overtime work to which plaintiffs assert they were entitled were not, in fact, similarly situated.  An arbitrator's decision denying the Union's grievance of plaintiff's complaint concerning overtime covers much of the period during which plaintiffs contend they were wrongfully denied overtime opportunities.  Though the decision does not cover the entire period at issue, it supports the conclusion that others were offered overtime plaintiffs were not for legitimate, nondiscriminatory reasons.  Similarly, in the April 26, 2007 summary of his investigation of plaintiff Strickland's complaints, Trautman reported that he had found that plaintiffs stopped working overtime when overtime work was no longer needed on the tasks they were assigned, and that those who had worked the longer weekday shifts of which plaintiff Strickland had complained were certified welders who were working on tasks that required certification which plaintiffs lacked.  Troutman cited evidence supporting the conclusion that decisions concerning ship assignments, which could affect the amount of overtime available, were made based upon legitimate, nondiscriminatory criteria.  In the absence of evidence rebutting this and other evidence Cascade has cited concerning the overtime issue, plaintiffs cannot establish that the comparators who received greater overtime

FINDINGS AND RECOMMENDATION - 17

opportunities were similarly situated.  In the absence of such evidence, plaintiffs cannot

establish a *prima facie* case of unlawful discrimination in the allocation of overtime

opportunities.

       In their response to Cascade's motion for summary judgment, plaintiffs assert that

Cesar Fernandez, a laborer, performed overtime work on pipefitting tasks that they should

have been offered.  However, they have cited no evidence showing that Fernandez performed

pipefitting work or that he was similarly situated in terms of task rights or ship rights.

Cascade has submitted unrebutted evidence that overtime work is assigned by task item

rights, ship rights, and the skills and abilities required for the work in question.  It has  also

submitted evidence supporting the conclusion that plaintiffs lacked the welding certification

required to perform at least some of the overtime work in question.

       In their response, plaintiffs have not identified other employees who had the same or

lesser rights and skills who were offered overtime work that was not offered to them.

Though they assert that Strickland had previously performed the "full scope" of welding

duties, they have not shown evidence that Cascade ever waived the certification requirement

for any workers, including plaintiffs.  In their response to Cascade's motion, plaintiffs also

assert that Cascade's conduct regarding the assignment of overtime was a pretext for

discrimination because the company "assigned overtime work to carpenters and laborers."

Even if plaintiffs had shown the existence of evidence that would support a *prima facie* case

of intentional discrimination, this unsupported assertion is not sufficient to cast doubt upon

the legitimate business related reasons Cascade cited for its system of allocating overtime

opportunities.  Plaintiffs' vague assertion that Cascade assigned work that plaintiffs should

FINDINGS AND RECOMMENDATION - 18

have been offered to "carpenters and laborers" is not the kind of "specific and substantial" evidence required to either show when any particular work was available, or that this work should have been offered to plaintiffs.  In the absence of such evidence, plaintiffs cannot establish that Cascade's professed business reasons for the decisions in question were a pretext for unlawful discrimination.

2. **Segregation**

Plaintiffs allege that they were unlawfully segregated from other employees during April, 2007, when they were assigned to work on a ship that was six to seven blocks away from the other workers.  They add that they were assigned to work "in the very lower portion of the vessel," and that "[n]o foreman would visit them for several days at a time."  When his deposition was taken, plaintiff Strickland testified that the segregation claim is based in part upon plaintiffs' separation from other pipefitters while they were working on the Yukon and the Greatland between April 3 and April 23, 2007.  Plaintiff Strickland testified that plaintiffs "weren't allowed to work with other fitters" and were "segregated from the rest of the crew." Plaintiff DeWeese testified that plaintiffs were sometimes segregated by being placed on different ships, and sometimes segregated by being assigned to isolated tasks and by being ignored and given no work instructions for hours at a time.  He testified that it seemed as if there was an effort to just get them "out of the way."

Cascade contends that the ship repairs that it performs simply require that workers occasionally "work independently or in an isolated location."  It further argues that, even if plaintiffs "were somehow in isolated locations more often than other employees," they

cannot show that they were subjected to any adverse employment action, because there is no evidence that they were assigned more onerous or difficult tasks, or required to work in more difficult conditions, than were other similarly situated workers.

The evidence before the court supports only the conclusion that Cascade's ship repair business sometimes required that its employees work in isolation in remote locations, and the conclusion that plaintiffs were not assigned more onerous or disagreeable tasks than those assigned to other pipefitters. Nevertheless, the motion for summary judgment should be denied as to the segregation component of plaintiffs' first claim for several reasons. While there is evidence that the nature of defendant's business required that workers occasionally work in remote and isolated locations, there is no evidence that workers were typically separated from all of their fellow workers in a particular craft for substantial periods of time, and ignored and left idle without work instructions. There is also no evidence that remote and isolated assignments typically lasted for several weeks at a time, and there is little evidence that the decision to assign plaintiffs in the manner of which they complain in April, 2007, was based upon particular business-related needs. A trier of fact that credited plaintiffs' description of the alleged segregation might find it significant that the two pipefitters who were separated from all other pipefitters, and assigned isolated tasks in remote locations, were the only African-American pipefitters who worked for Cascade during that period, and were individuals who were at the same time alleging race-based discrimination.

Though plaintiffs have testified that they were not required to perform unusually unpleasant tasks or to work under more difficult conditions, a reasonable trier of fact finding

that plaintiffs were segregated on the basis of their race might conclude that the segregation

was an adverse employment action, because of the stigma that it would imply based upon an

immutable characteristic.  Being deprived of the camaraderie of working with others, and

being part of a larger team with a common goal, could be an adverse employment action if it

were based upon race.  Being ignored by supervisors for sustained periods, and left to idly

wait for needed instruction, could have significant effects on a worker's sense of self worth.

Perhaps more significantly, a trier of fact might conclude that a worker whose talents and

efforts are not fully engaged will not likely earn the reputation and gain the experience

needed to obtain further employment with or advancement by the employer.  Cascade's

contention that segregation, without more, does not constitute an adverse employment action

is reminiscent of a "separate but equal" model of racial equality that federal courts have long

rejected.  See, e.g., Brown v. Board of Education, 347 U.S. 483, 493 (1954).

A trier of fact crediting plaintiffs' testimony could conclude that plaintiffs were

qualified to do the work being done by other pipefitters, were subjected to an adverse

employment action by being segregated and ignored, and that others who were not in

plaintiffs' protected class were treated more favorably by being allowed to work with others

under circumstances more favorable to the possibility of further employment and

advancement.  They have therefore made out a *prima facie* case of discriminatory

segregation.  Cascade has responded with evidence supporting the conclusion that the

assignments of which plaintiffs complain were made based upon legitimate considerations

other than race.  However, a trier of fact might question the underlying reasons for the

particular assignments at issue here.  A trier of fact accepting that there was a need to assign

FINDINGS AND RECOMMENDATION - 21

two pipefitters to isolated work in remote locations might conclude that it was more than

mere chance that the two persons selected for the isolated and remote tasks were the only two

African-American pipefitters.  This is particularly so in light of other evidence of race-based

animus in Cascade's workplace.  Because a trier of fact might conclude that Cascade's

proffered reasons for the particular work assignments at issue here were not credible, the

motion for summary judgment should be denied as to the portion of plaintiffs' first claim that

is based upon alleged segregation.


3. **Denial of promotion for Strickland**

Plaintiff Strickland alleges that Cascade's decision to promote Kevin Peterson rather

than him to a foreman position in March, 2007, was racially motivated.

Cascade has produced evidence that plaintiff Strickland never informed anyone in

management at Cascade that he was interested in becoming a foreman, and that he took no

steps to apply for the foreman position when it became open.  It has also shown evidence that

Peterson had the technical knowledge needed to supervise pipefitters and significant relevant

experience, including work as a ship superintendent which was higher ranking than the

foreman position.

Plaintiff has not produced any evidence showing that he applied for and was denied

a promotion to the foreman position, or showing that Peterson was not qualified for the

position.  Plaintiffs have not argued this portion of their first claim for discrimination, and

summary judgment should be granted in defendant Cascade's favor on this issue.


FINDINGS AND RECOMMENDATION - 22

4. **Strickland's Suspension**

As noted above, following incidents involving two supervisors, plaintiff Strickland was suspended for two days beginning on May 25, 2007.  Cascade asserts that the suspension was a reasonable sanction imposed in response to threats Strickland had made against Wolvert and Lowe, who were Cascade supervisors, and plaintiff's earlier altercations with Shropshire and Leino.  Strickland contends that other workers who were not in his protected class were not subjected to similar sanctions.  Cascade contends that Strickland cannot make out a prima facie case of discrimination based upon his suspension because he has shown no evidence that others with a similar disciplinary history were sanctioned less harshly.

Though I agree that plaintiff Strickland has not shown that another worker whose disciplinary record neatly corresponded with his record was disciplined less harshly, I am satisfied that he has made out a prima facie case of discriminatory punishment, and that summary judgment is not appropriate on this aspect of plaintiff Strickland's claim.  Though it does not include evidence that another worker with Strickland's exact disciplinary record was treated more favorably, the record does include evidence that other workers who were involved in heated disputes and altercations were not suspended, but instead received only warnings.

In addition, it is significant that plaintiff Strickland disputes Cascade's account of the events giving rise to his suspension.  A trier of fact who credited Strickland's account of these events, and who found Cascade's witnesses less credible, might conclude both that Strickland did not act in a threatening manner, and that Cascade supervisors did not objectively and fairly investigate the underlying incidents.  A reasonable trier of fact who

credited plaintiffs' accounts of other aspects of the work environment at Cascade and

plaintiffs' experiences at that workplace in 2007 might infer that Strickland's suspension

reflected discriminatory animus.  Under these circumstances, plaintiffs have made out a

*prima facie* case of discriminatory punishment and adequately responded to the legitimate,

nondiscriminatory reasons Cascade has proffered for imposing the suspension.  Summary

judgment should therefore be denied on this element of plaintiffs' first claim.


5. **DeWeese's Termination**

As noted above, plaintiff DeWeese was deemed to have quit working for Cascade

after he failed to report for work or contact Cascade for three days following his arrest at the

workplace, and was declared ineligible for rehire.

Cascade asserts that plaintiffs cannot make out a *prima facie* case that DeWeese was

terminated and deemed ineligible for rehire because of his race because plaintiffs cannot

show that any other employees were treated differently.  I agree.  Cascade has submitted

unrebutted evidence that, under its established employment policies, an employee who failed

to appear for work or communicate with it for three days was deemed to have quit.  It has

also cited DeWeese's own testimony that he never called Cascade after being arrested at the

workplace.  Cascade has also submitted unrebutted evidence that Trautman designated

DeWeese as ineligible for rehire because he had a history of violent acts toward women in

secluded areas, and Trautman was concerned because Cascade's female employees

sometimes worked in isolated areas in the shipyards.  Though plaintiffs have cited evidence

that Cascade employed some workers who had felony convictions, there is no evidence that

Cascade ever knowingly hired or retained an employee with DeWeese's record of violence toward women.  Under these circumstances, plaintiff DeWeese cannot establish that Cascade discriminated against him on the basis of his race when it determined that he had quit and precluded his rehire.

In the response to Cascade's motion for summary judgment, plaintiffs note that DeWeese's "termination notice" was generated by a computer after the second, rather than the third, day after he had first failed to appear at work or contact Cascade.  This is insufficient to either create a prima facie case of unlawful discrimination, or cast doubt on the legitimate reasons Cascade has cited for its conduct following DeWeese's arrest.  That Cascade's computer generated a notice a day early can support no inference of pretext, because the record supports only the conclusion that the notice was automatically generated, and was not sent to the Union until DeWeese had neither appeared for work or contacted Cascade for three days.  Cascade is entitled to summary judgment on this portion of plaintiffs' first claim.


II. **Plaintiffs' First Claim, Part II: Alleged creation of a hostile work environment in violation of Title VII, ORS 659A.030(1)(f), and 42 U.S.C. § 1981**

To establish a race-based hostile work environment claim, a plaintiff must establish that, because of his race,  he was subjected to unwelcome verbal or physical conduct that was sufficiently severe or pervasive as to alter the conditions of employment and create an abusive working environment.  Surrell v. California Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir. 2008).  In order to create a hostile work environment, the conduct complained of

must be objectively offensive, from the perspective of a reasonable person in the plaintiff's

position, considering "all the circumstances." Oncale v. Sundowner Offshore Servs., Inc.,

523 U.S. 75, 81 (1998).  In determining whether conduct is sufficiently offensive to create a

hostile work environment, courts consider the frequency and severity of the conduct, whether

it is physically threatening or humiliating, and whether it unreasonably interferes with the

plaintiff's work performance.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

An employer is liable for a hostile work environment created by a plaintiff's

co-workers if the employer knew or should have known of the conduct creating that work

environment and failed to take prompt and appropriate corrective action.  Ellison v. Brady,

924 F.2d 872, 882 (9th Cir. 1991); Burlington Indus v. Ellerth, 524 U.S. 742, 765 (1998).

Were it not for the issue of plaintiffs' alleged segregation during a several week

period in April, 2007, I would recommend granting Cascade's motion for summary judgment

on plaintiffs' hostile work environment claim.  Plaintiffs cite several incidents that had either

overt racial references, such as Strickland's confrontation with Shropshire, or arguably

implied racial references, such as the drawing of Strickland on a bathroom stall: DeWeese

testified that it was an "accurate drawing of a black man with big lips,' and plaintiffs testified

that they found the picture offensive.  That two Caucasians were also depicted in one drawing

does not necessarily remove any racial stigma from Strickland's depiction.  Without the

addition of the segregation issue, these incidents, other confrontations involving Strickland

that may have had racial overtones, and the "White Power" e-mail are not sufficiently severe

or pervasive to alter the conditions of plaintiffs' employment and create an abusive working

environment.

FINDINGS AND RECOMMENDATION - 26

Though it presents a close question, I conclude that plaintiffs' allegations of segregation describe conduct that, if established, could permit a reasonable trier of fact to find in plaintiffs' favor on the hostile environment claim.  A trier of fact could find that at least some of the incidents and conduct by co-workers of which plaintiffs complain reflected a discriminatory animus, could conclude that Cascade knew or should have known of the conduct, and could conclude that Cascade's responses to at least some of the incidents were insufficient.  In the context of these other events, a trier of fact crediting plaintiffs' testimony could conclude that plaintiffs were isolated and segregated because of their race during a sustained period in April, 2007.  Unlike much of the other conduct on which plaintiffs base their hostile environment claim, the alleged segregation was imposed by supervisors, not by co-workers, and therefore is not subject to Cascade's defense that its responses were timely and appropriate.

I consider the alleged segregation to present a more significant issue than is raised by the other conduct plaintiffs cite in support of their hostile environment claim.  Depending on the testimony found credible at trial, it appears that a trier of fact concluding that plaintiffs were intentionally physically segregated and isolated on the basis of their race might conclude that doing so created a hostile work environment.  If established, this physical separation lasted all or most of every work day, for a period of several weeks.  Sustained physical separation and isolation on the basis of race could be deeply disturbing.  This is especially true given that, if it were occurring, plaintiffs could assume that other workers, including their would-be co-workers, were aware of the discrimination.  This knowledge alone could be sufficient to alter the conditions of employment.  However, as noted above,

segregation and isolation could also deprive workers like plaintiffs of the opportunity to develop the reputations, skills, and work record needed to secure ongoing employment with the possibility of advancement. Under these circumstances, that the work performed while segregated was no more onerous, and that the conditions under which it was performed were no less favorable, is insufficient to defeat plaintiffs' hostile environment claim.

The parties have cited no decisions directly addressing segregation in the context of hostile environment claims, and I have found few decisions addressing this issue. I assume that the paucity of cases I have found addressing segregation as a component of a hostile environment claim reflects the rarity, rather than an acceptance, of such practices in modern workplaces. I do note that, in Jordan v. City of Cleveland, 464 F.3d 584, 598 (6th Cir. 2006), the court cited "isolation and segregation" as factors supporting the conclusion that treatment to which an employee was subjected was sufficiently "severe or pervasive to alter the conditions of . . . employment and to create an abusive work environment." In the present action, I am satisfied that material issues of fact exist as to whether plaintiffs can establish such a claim. Accordingly, Cascade's motion for summary judgment on this claim should be denied.

In reaching this conclusion, I have not considered the declaration of Lynn Morris, submitted by plaintiffs, concerning the adequacy of Cascade's anti-discrimination policies and procedures, including Cascade's responses to plaintiff's allegations of racial discrimination. Cascade asserts that plaintiffs' use of an expert's declaration is inconsistent with the parties' earlier agreement concerning designations of experts. However, my decision to not consider Morris's declaration is not based upon resolution of that issue in

FINDINGS AND RECOMMENDATION - 28

Cascade's favor, but upon the conclusion that a trier of fact could fairly evaluate the

adequacy of Cascade's policies, practices, and investigations without reference to expert

opinion, and that many of Morris's opinions state legal conclusions that are generally

inadmissible from an expert witness.  If this case is tried, the trial judge will likely have the

opportunity to determine the relevance and admissibility of Morris's testimony.

In deciding that material issues of fact remain as to plaintiffs' hostile work

environment claim I also have not considered allegedly discriminatory acts involving other

employees, at times outside of the period in 2007 during which plaintiffs worked for

Cascade.  I need not make a definitive decision as to the relevancy of these incidents because

I am satisfied that the hostile work environment claim should go forward whether or not

those events are considered.


III. **Plaintiffs' Retaliation Claim**

In their second claim, plaintiffs allege that Cascade retaliated against them in

response to their opposition to unlawful racial discrimination in violation Title VII, ORS

659A.030(1)(f), and 42 U.S.C. § 1981.  In order to establish a claim of retaliation in violation

of Title VII, plaintiffs must show that they engaged in protected activity, that they were

subsequently subjected to an adverse employment action, and that a causal link exists

between the opposition and the adverse action.  See, e.g., Brooks v. City of San Mateo, 229

F.3d 917, 928 (9th Cir. 2000).  Retaliation claims asserted under § 1981 are analyzed in the

same manner as claims brought under Title VII.  E.g., Manatt v. Bank of America, 339 F.3d

792, 798  (9th Cir. 2003).  As noted above, the same analysis applies to claims brought under Oregon anti-discrimination statutes.

When his deposition was taken, plaintiff Strickland testified that Cascade retaliated against his complaints concerning racial discrimination by calling him to the office "multiple times," and threatening to "write [him] up," suspend, or terminate him.  Asked if Cascade did anything else to retaliate against him for opposing unlawful race discrimination, he replied "No, they didn't."  He did not testify that his actual discipline–the temporary suspension–was retaliatory.

Plaintiff DeWeese testified that Trautman retaliated against him by failing to properly investigate plaintiffs' complaints.  Asked if there were any other acts of retaliation that he believed were carried out because of concerns he had raised, DeWeese replied "No."

In their response to Cascade's motion for summary judgment, plaintiffs seek to expand their retaliation claim to include Strickland's suspension and DeWeese's termination and ineligibility for rehire.

Cascade contends that plaintiffs' retaliation claim is limited to the alleged retaliatory conduct described in plaintiffs' depositions.  I agree.  Plaintiffs had a full and fair opportunity to set out all the conduct upon which their retaliation claim is based, and had an obligation to cite all of the allegedly retaliatory conduct so that Cascade's counsel could fully explore the claim.  Cascade had a right to rely on plaintiffs' testimony as to the scope of the retaliation claim.  Depositions would contribute little to the discovery process if parties were allowed to expand the scope of their claims after depositions were completed.  Therefore, in analyzing plaintiffs' retaliation claims, I will consider only plaintiff Strickland's assertion that he was

repeatedly called to the office and warned of possible discipline, and plaintiff DeWeese's assertion that Truatman retaliated by failing to conduct a proper investigation.

In their deposition testimony, plaintiffs have not described the conduct which constitutes the "adverse employment action" required to state a valid claim for retaliation. Merely being called to the office a few times and informed that discipline could be imposed in the future for improper conduct is simply not of sufficient severity to constitute an adverse employment action. DeWeese's allegation that Trautman retaliated in response to plaintiffs' claims by failing to properly investigate does not describe an actionable adverse employment action. Even if a failure to properly investigate could, by itself, constitute such an employment decision, the evidence before the court would not support the conclusion that Trautman's investigation was so inadequate that it could fairly be characterized as retaliatory. At this point in the proceedings, I need not and do not reach the question whether Trautman's investigation adequately responded to plaintiffs' complaints of alleged racial discrimination. It is sufficient to note that the investigation appeared to be designed to yield accurate information. Though a fact finder might disagree with the results of the investigation itself, there is simply no evidence from which a trier of fact could conclude that Trautman intentionally conducted a flawed investigation in retaliation for plaintiffs' complaint.

Cascade is entitled to summary judgment on plaintiffs' retaliation claim.

IV. **Plaintiffs' Third Claim**

Plaintiffs' third claim alleges that Cascade violated § 1981 by impairing plaintiffs' "employment contract rights" on the basis of their race.  The parties have not argued that this claim is based upon any different conduct than that upon which the first two claims are based, or that this claim should be analyzed differently than plaintiffs' Title VII claims.  This is consistent with decisions cited above noting that courts apply the same legal principles in analyzing claims brought under Title VII and § 1981.  See Fonseca, 374 F.3d at 850; Mannat, 339 at 798.

Because claims brought under Title VII and § 1981 are subject to the same analysis, Cascade's motion for summary judgment on the third claim should be granted in part and denied in part in a manner consistent with the first two claims.  As with the first claim, the motion for summary judgment should be granted on the third claim as to the overtime issue, Strickland's promotion claim, and DeWeese's termination and ineligibility for re-hire, and should otherwise be denied.  To the extent that the third claim is based upon the retaliation alleged in the second claim, the motion for summary judgment should be granted.

## Conclusion

Defendant Cascade's motion for summary (#52) should be GRANTED IN PART and DENIED IN PART as set out above.

### Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due May 26, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 9th day May, 2011.


/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge